Our fourth case for this morning is United States against Sanford. Mr. Hillis. Good morning. I please the court. My name is Daniel Hillis. I'm with the Federal Public Defender's Office and I represent Mr. Sanford on this appeal. He raises three issues, two of which have been conceded with regard to the supervised release. So with the court's permission, I'll focus on suppression issue and that is surely the main event here. Beginning with standing, we have asserted two variants of the standing that allows Mr. Sanford to make the suppression motion gives him the basis for his relief. And the first part of that is the expectation of privacy that we believe drives under raucous. We've made our best efforts to distinguish raucous because my client is not a mere passenger in the sense that the defendant in raucous was. But I believe that the stronger argument for standing is the Brendan argument. And the Brendan issue was something that the government acknowledged Mr. Sanford has standing by virtue of Brendan to challenge the stop. You say he wasn't a mere passenger? With respect to the raucous analysis, that is because unlike a typical passenger who is merely in a vehicle with no ability to control where the vehicle goes, who gets in it, things that would show dominion and control over the vehicle, my client has been entrusted with the vehicle. And I understand it's a rental vehicle, but nevertheless it is not much different than if somebody were to hand me car keys and allow me to drive the vehicle, I would have an expectation. But he wasn't driving? No, or be a passenger in it for that matter. I mean the problem with your argument though is he would have had even more control over where the vehicle went if he had been driving it himself, as he was actually at the very outset of this. But under our Haywood decision, he would not have been able to challenge the search because this was, that was the same sort of thing. It didn't, Mr. Haywood didn't have a valid driver's license and he wasn't permitted to do this. Now he's sitting in the front seat, I presume your theory is essentially, you know, she's a cab driver for him, so he's telling her where to go, but I don't see why he's any different from what he would be if he were the actual driver. If he were the actual driver, he can't challenge the search. Now challenging the stop, the detention, is a whole different thing. Everybody in the world is detained and I don't think anybody has any problem with his ability to complain about that. But it's a somewhat different, it's a narrow line, but it's an important one. Surely, and so I believe that the case is... So why doesn't Haywood govern, your first point? Haywood is based on Rackus and Rackus is talking about expectations of privacy and it talks about in the ordinary course, by the way. So it does not exactly create bright lines under Rackus. It talks about mere passengers. But Haywood also says if you're unauthorized by the rental agreement to drive, you're unlicensed, you're in this car, you're driving it around, you lack, you don't have a reasonable expectation of privacy. He, according to your theory, is in a sense the puppeteer. You know, he is the effective driver, even though he's not the one sitting behind the wheel. So okay, fine, he's not violating the driver's license laws, but he equally has no expectation of privacy in a car that doesn't belong to him, that he's giving an unauthorized driver the ability to drive. I take issue with that. Just because he's not on the rental car contract, if there's any damage, if there's anything that is to be quibbled with about that, let the rental car company sue him, that's fine. But he is putting his things in a vehicle that's been entrusted to him. And I think that, under the relatively fluid strictures of standing, would suggest both the subjective and an objective expectation of privacy. It's true. What was wrong with the police looking at the arrest records? That would trend then into the Rodriguez type analysis. And so Rodriguez allows for inquiries related to the drivers, which is perfectly sensible, and it relies on Delaware versus Proust for that. So does Rodriguez preclude inquiry into the other people who are also detained? I don't see that. Rodriguez, I think, is fairly definite that it says that the inquiries are supposed to be limited to the purpose of the mission and that cites to Delaware versus Proust talk about going in. But if you have suspicions, if you have, if the police have suspicions, why shouldn't that be enough to let them, you know, do a computer search for arrest records? They didn't have suspicions until they started asking them questions. They thought it was odd that he wasn't driving and they thought, you know, they were, the occupants were making poor eye contact and he thought them evasive, unusually evasive, compared to his other experiences with stopping people for driving violations. But, Your Honor, those questions all go to a passenger, and this passenger has nothing to do with the speeding. And so Rodriguez talks about what are the permissible inquiries, and he talks specifically about asking the driver for a driver's license. I don't understand, if you, if you, if the police see this car full of people who look evasive and so on, and why isn't that, why doesn't that create a reasonable suspicion, which can be verified in seconds by just checking the computer in the police car for the criminal histories of these people. We're creating an avenue then for the police to stop any vehicle, start engaging in questions, to confirm suspicions in another criminal matter. No, that isn't true. So, remind me. If you stop, if the car is stopped for a then that, I should think, would be enough to allow them to do a very short computer search for their criminal records. Even if that were so, it was not a search. Even if that were so, tell me why it's not so. Because I don't think it's permissible under Rodriguez. Why? If you are, if there are suspicious circumstances, why can't the police take a, you know, make a brief, non-obtrusive search of public records to see whether these people are criminals? Because I have to rely on the explicit language of Rodriguez. Well, give me a reason, rather than a precedent. There's an easy reason. It's unrelated to the purpose of the stop. So what? I don't understand. So what? Suppose the police officer is walking along this street and he's on his way home, or something, and he sees a crime. You wouldn't say, well, he wasn't, he wasn't, that wasn't why he was there. He was just going home. Just an accident that he saw a crime. You wouldn't say that, that he can't do anything. Well, similarly, if he stops a car because of a traffic violation, and he just looks in and sees suspicious circumstances, doesn't that allow for some further non-intrusive, momentary investigation? If the circumstances that allowed for the suspicion were immediately apparent, that would be one thing. But in this case, what allowed for the suspicion was the question and the answer. The answers that were given to the question created the suspicion, and the question shouldn't have been asked. I have to rely on that, because that's what Rodriguez allows me to rely on. But there's a different way of looking at this case, too, which I don't think helps you, even under Rodriguez. I watch these videos, and assuming that there is just this two-minute, nobody seems to be contesting that there's just this two-minute gap between number one and number two, he's finished the criminal history check about eight minutes into the stop, which is even inside the amount of time that you think a traffic ticket needs, which was ten minutes, and he estimates his usual time is 15. But once he has the criminal history, on top of the other points that Judge Posner was referring to, he's certainly got Terry-like reasonable suspicion, and we're not dealing with 404B here, we're not dealing with propensity problems or anything else. He's looking at these guys, and he says, wow, they are deeply into all kinds of trouble. Even his conversation with the other officer shows he's sort of stalling until the drug dog can come, but if he's got reasonable suspicion by that time, that takes him out of Rodriguez. I don't think so. I think that it puts him squarely into Rodriguez. That's what the language of Rodriguez says, actually. Rodriguez talks about what other permissible inquiries that can be made of the driver, not of the passengers, and so all of this length of time that is cumulative. No, but it also carves out reasonable suspicion for other problems, basically, because the, you agree, the initial detention is all right. This is a problem of their own creation. They prolonged this, and this is the problem that we're going to have. What is the wrong that you think happens in a case like this? I think that the wrong is it allows for searching inquiry into suspicions on other people's activity. Tell me what is wrong with that. Because I don't think it's permissible under Delaware v. Prusa or, more recently, under Rodriguez. No, no, I'm not interested in oppressing. I'm interested in some common sense. Common sense? To be accosted by police officers because you were at the happenstance of being a passenger in a vehicle, and now you're subject to their inquiry. Well, you're accosted. The car is stopped because it's violating traffic laws. And the police are obviously going to glance inside, and if they see people being evasive, avoiding eye contact, and if the officer has reason to believe that this is unusual behavior and suspicious behavior, why shouldn't that be sufficient just to look at his computer to see if they are criminals? Everything that you just described can break either way. So if an officer says, in my experience, it's unusual that he didn't make eye contact, or he says it's unusual in my experience that he did, everything allows the officer to keep doing something that prolongs the stop that is irrelevant to the purpose of issuing the speeding ticket, such as then further inquiring then into the criminal histories and doing other things that are unrelated. Then the dog comes. All of this allows officers to make the far-reaching inquiries. No, no, this comes in, there's a progression. The dog comes after other suspicious information is developed. You can't just wrap it all into one single, it's not as if he stops the car and he has a dog in his car with him, right? Right, and my answer is still the same. What are the wrongs, I mean, are innocent people going to be harmed by this? Yes, potentially they are. No, because if the computer search shows no arrest or criminal record, then there's not going to be a dog, right? I don't think that's true. They weren't even sure of the accuracy of the information. They say it spit out warrants, but apparently not for you. The misinformation that they might get allows them to do something that might harm an individual, an innocent individual in a criminal case. I think that's very likely. How does it harm the innocent individual? So if the car is stopped and then they get bad information as a result of their inquiries that they never should have made that allows them to have a search and so forth, if the individual is taken into custody, all of these things that happen, those are constitutional harms. If an individual has a clean record, the dog will not alert to him, so why would he be taken into custody? The dog would alert to the vehicle, the person would be in the vehicle, even if they have no knowledge of the drugs in the vehicle, they're all going down to the jailhouse. Well, that's your conjecture. Of course, that's not this case. It's a possibility. It would be my concern. So I want to go back to the statement that you made, that if the police officer looked at the person and it appeared to the police officer their behavior was suspicious based on their experience. Like you said, it could tilt either way. So I want to know, can the police officer rely at all on the expressions of the people that he sees in the car? Because it sounds like you want to take that away. It sounds like you want it to be something affirmative that maybe is said, or police officers have to read the movement, the tilt of it. Are you saying that that is not acceptable? No, it is acceptable, of course. But it has to be reasonable, and it has to be a reasonable inference that they draw from it. And I think there's a Fourth Circuit case from about three years ago that talked about how when any vehicle is stopped, the people who are in it are going to be nervous and expressing these things that are routinely relied upon by officers to say, there we go, furtive gestures, behavior that allows us to have reasonable suspicions, but they're not. But that's not the issue here, Your Honor, and I respect your question, but my more fundamental concern is make the stop, pertain to the mission, things that go beyond that are impermissible, and that's what happened here. Okay, thank you very much, Mr. Hillis. Mr. Raynor. May it please the Court, my name is Micah Raynor. I represent the United States in this case. So, Mr. Raynor, I have to tell you that when I first read the things that the police officers here were citing as their reasons for making these stops, and then worse, when I looked at the video, I thought that it was so overbroad. Here's Interstate 55, and it seems that if you're driving down Interstate 55 southbound after midnight, then you must be a bad guy, and particularly if you've come from Chicago. And as you may know, Interstate 55 heads down to New Orleans, or you can peel off at East Memphis and go on down into Texas through Texarkana. And when you look at that video, it's like a Grand Prix. I mean, there are cars zooming by every two seconds. It's almost hard to hear the conversation because it's such a busy road, even at that time of night. So I don't see how driving southbound on I-55 from Chicago is something that raises suspicion that you're doing anything other than just speeding. Of course she was speeding. He clocks her at 83, 84 miles an hour. But he cites these other things like, oh, you know, you're coming down south on I-55 from Chicago, as though this is culpable information. Does everybody who leaves Chicago subject to address because Chicago has a lot of drugs flowing through it? Certainly not, Judge. I think that's traveling from what's described as a sore city, Chicago, to a police officer who's in a rural area could be seen as a small part of the totality of circumstances. I don't see how it's even a smidgen, actually. Maybe the other stuff, maybe the evasive demeanor. Certainly if we can get up to minute eight and we find out that there's a fairly lengthy history of arrests, now this wasn't a conviction record, I understand it was an arrest record. Maybe there are other things that save this, but honestly I don't see how driving southbound on I-55 shortly after midnight is anything but the most benign piece of information. It's a huge trucking route. There are millions of trucks going by. Do you think they're all leaving a sore city filled with cocaine? Well, Chicago being filled with cocaine, I'm not sure about the merits of that, but I don't think you have to get to minute eight. So why these make-weights? That's what bothers me. The police officers come up with these completely meaningless statements, and they dilute the force of maybe some of the things that really should enable them to pursue a reasonable suspicion a bit further. The stronger force behind reasonable suspicion, I agree, is not traveling from Chicago to Peoria. Thank you, since we have a courthouse down in Peoria, and our staff are known to go down there with some frequency. But before you get to minute eight, the rental agreement is significant. When Trooper Fazell first pulls up to the car, he asks fairly routine questions. Where are you going? Is this car rented? Who's in the car that rented the car? Who's authorized to drive the vehicle? Right, and she mumbles the answers. He has to repeat some of the questions. Right, and first he's handed an agreement that's Scott and Karen, so he has a certain amount of suspicion there. And then he's handed a second rental agreement where no one in the car is listed on that agreement, and the agreement's only for one person, Gerald Smith. And they've already told him that Gerald Smith is the renter. And then that's when he looks at the first agreement. He doesn't see that name there. And you're right, nobody in the car, which is obviously a breach of their contract with Enterprise Rent-A-Car. But otherwise, is that really a big deal? In this case, yes. I would say that that officer has had specific training saying that in interdiction, that third-party rental cars are something that drug dealers use to avoid forfeiture of the vehicle. He said that in his past prior experience that he's encountered contraband in cars rented by third-party agreements. So you can stop all cars. I'm sure he's also encountered contraband in cars owned by people. He has. So the set of cars in which contraband may exist is the full set of cars. Yes, but to that officer, a known tactic of drug dealers is to use rental cars that are not rented by the driver. So you would agree that the fact that it's late, the fact that they're driving from Chicago, are not helpful? If not helpful, they're minor. I think the Trooper Fizell, in his hand, when he first gets the rental agreement, it says it was rented in East Peoria around noon. These people are driving back in the middle of the night around 12 after having purportedly visited family. That's quite a short trip and may arouse suspicion. I take short trips all the time, so I don't know that that... Yes, they've driven from Peoria up to Chicago maybe for a quick visit. A better fact for you is that they don't know the name of the hospital that they went to. That I can easily see a trooper thinking, come on, you drove all the way from Peoria to Chicago to visit somebody you don't even know, whether it was Mercy or the University of Chicago or whatever. Correct. That fact was derived after the criminal history was run. I'm just saying that the third-party rental agreement and the occupants of the car's demeanor supports enough reasonable suspicion to just get to the point where you're running the criminal history. Now, do you think that under Rodriguez and the traffic stop line of cases, you get the first 10 minutes free or you get the first 15 minutes to do whatever you want, run the criminal histories, write up the ticket, what have you? I don't think Rodriguez says that. I think Rodriguez makes a specific mention to how bonus time is not something that's applicable. But what Rodriguez does have is a carve-out for extending the stop based on reasonable suspicion or engaging in other inquiries beyond the traffic stop mission based on reasonable suspicion, and that's what the government submits happened here. And am I reading the record correctly or looking at this tape correctly that by around minute eight or so he has already now run the criminal history? I believe that's correct. He's in the car and there's a certain amount of time where he's briefing other officers, and at least I would say he probably hasn't read through everything because it's voluminous, but he's read through enough for his suspicions to be confirmed. And he mentions a couple of times. At what point is he saying that they're gangster disciples, et cetera? Yes, the GD, yes. Yeah, he's calling them. But that's still within the first 15 minutes or so too, isn't it? Yes. He starts dawdling, starts talking about a euchre game, he starts, you know. There is a time between I believe about minute eight and minute ten where he's talking about a euchre tournament and waiting for the dog to arrive, yes. And he keeps saying, I'm dawdling until the dog comes, then he catches himself and says, well, of course I'm processing. Correct. But he is sitting there with someone driving within a third-party rental agreement, people whose demeanor he thought was different than 99 percent of other passengers that he stops, and he runs the criminal history check and they have gangster disciple information pops up and there's also significant criminal history. See, I think that's the most helpful information. If that's done by the 10 to 15 minute mark, it seems to me that gives him plenty of reasonable suspicion to wait for the dog because, as Judge Posner said, it develops a step at a time. He doesn't know that when he stops the car. He just knows that he's clocked a car at 83, 84 miles an hour. But he begins to accumulate information as time goes on and not as 30 minutes goes on. He accumulates it sooner, which may be important under Rodriguez. Yes. I think Rodriguez limits certain non-traffic inquiries that are done without reasonable suspicion. The government's not contesting that. What the government is saying is that there was enough reasonable suspicion developed in the initial portions of the stop to justify further questioning. On this standing issue, I do think that the case is prior precedent on unlicensed drivers of a rental car who are not on the rental car agreement is controlled. Okay, let me give you one quick other question on the supervised release. This is a negotiated prison term of 180 months. So a question before us is whether we should limit, should we decide to remand this as both parties agree we should on supervised release simply to the supervised release portion of the sentence or whether a plenary resentencing remand is appropriate. The government's position, as I take it, is that there's no objection to limiting the remand to supervised release. That's correct, Judge.  The problem with that is that supervised release, of course, is actually a form of custody. And if you're going to enlarge or reduce that form of custody, the judge may want to adjust the prison sentence. Wouldn't that be... So wouldn't it be better for the judge to consider the sentence as a whole? Although the way this plea was taken, I agree, was construed by the district court as a 11C1C plea. So that 180 months was considered binding by the court if it was to accept the plea at all. So the government's position is... You don't want to unravel the whole plea agreement. I do not want to unravel the whole plea. I believe there's a mandatory eight-year supervised release regardless of the conditions. And if the plea were to unravel, it would be back to square one in terms of even whether the person was adjudicated guilty. Whether what? If the plea is not accepted, the district court construed it as a C plea. So if the district court rejects the C plea, then we're not even at the guilt stage anymore. Okay. All right. I seem out of time. Unless the court has questions, I'm finished. No, apparently not. Thank you very much. You ran out, but we'll give you another minute, Mr. Hillis, if you need it. Thank you, Your Honor. Brendlin, at page 259, cites Lafayette, noting that the length of a passenger's detention allows the passenger to assert a Fourth Amendment challenge. Building on that, the fact that the car was driven by a person not listed in the rental agreement was not the reason that the officer called the canine. Of course, the canine was brought in after the mission of the traffic stop had ended. The ticket had been issued. My client was therefore unreasonably seized, unlawfully seized, from that point forward. That gives him a basis to contest what is found in the car under Brendlin and under Rodriguez. It's therefore an unreasonable detention, and fruit of the poisonous tree doctrine applies. The evidence that is found in the vehicle and any statements and so forth that come after that point are all subject to suppression. And finally, the Rule 11C1C agreement is a significant hurdle to having a full resentencing in this case, and I think that that problem is best avoided. So he would go free? Is that your position? There were seven counts, Your Honor. I don't know what the government would wish to do with the remaining counts, but on this count, I think that it would be appropriate to say the evidence is suppressed, and I don't think the government would have a basis to proceed on this particular count. Those questions mean nothing to me. Thank you. Thank you very much. Thanks to both counsel. Take the case under advisement.